A94A0892, A94A0893. CRS SIRRINE, INC. v. DRAVO
CORPORATION et al.; and vice versa.
(445 SE2d 782)

ANDREWS, Judge.

Dravo Corporation (Dravo) and its wholly owned subsidiary, Weyher/Livsey Constructors, Inc. (Weyher/Livsey), entered into an agreement with CRS Sirrine, Inc. (Sirrine) to jointly pursue the contract for construction of a large, technically complex power plant for the United States Navy at the Norfolk Naval Shipyard in Portsmouth, Virginia. The agreement combined the parties' capabilities to design and construct the project. Although Weyher/Livsey had experience in constructing large power plants, it lacked the necessary expertise and experience to design the power plant and perform the engineering work on the project. Although Sirrine had expertise and experience in the design and engineering aspects of the power plant project, it lacked the capability to construct the power plant. Dravo was included in order to assure bonding capacity on the project.

As a summary of the intended project, the Navy prepared conceptual diagrams, drawings and initial performance specifications and a narrative about the power plant and required that potential bidders on the project first submit technical proposals explaining their qualifications and how they would design and construct the project. If the Navy accepted a potential bidder's technical proposal, then it became eligible to submit a bid on the project. The power plant was a design-build project in which fixed-price competitive bids were submitted on the basis of preliminary design and engineering done by the bidders and the detailed design and engineering work was done after the award of the contract on a fast track basis in conjunction with the construction of the project.

In a letter agreement, the parties agreed that Sirrine would take the lead in preparing and submitting the technical proposal and, if the technical proposal was accepted, Weyher/Livsey would assume primary responsibility for preparing and submitting the bid based on the technical proposal. Sirrine was responsible for supplying the technical information needed to prepare the bid. The agreement further provided that Sirrine, as design engineer, would not guaranty the ac-

curacy of Weyher/Livsey estimates used in preparing the bid. Pursuant to their agreement, a technical proposal was submitted and accepted and a bid of over $100,000,000 was submitted to the Navy in the name of the Weyher/Livsey-Dravo-Sirrine Joint Venture. The joint venture was the low bidder and was awarded the contract. The parties subsequently signed a formal joint venture agreement setting forth their respective responsibilities in pursuing and performing the construction contract and executed a contract with the Navy to build the project.

The power plant cost substantially more to construct than the winning bid and Dravo and Weyher/Livsey incurred losses on the construction aspects of the project in excess of $30,000,000. Dravo and Weyher/Livsey brought suit against Sirrine alleging that breaches by Sirrine caused over $12,500,000 of the loss in added costs to construct the project. The action was tried before a judge. The trial court found that Sirrine breached contractual and fiduciary duties owed to Dravo and Weyher/Livsey under the joint venture agreement and entered judgment against Sirrine in the amount of $5,518,812.

The trial court's rulings on liability and damages are contained in the court's 24-page order and judgment setting forth its findings of fact and conclusions of law. In general, the court ruled that Sirrine breached contractual and fiduciary duties imposed upon it to provide sufficient, accurate information to Weyher/Livsey upon which to base the bid; to make reasonable efforts to design the project within budgeted quantities; to track quantities in its design, and to promptly notify Weyher/Livsey or Dravo that budgeted quantities would be exceeded.

The trial court considered evidence relating to the various types of damages that Weyher/Livsey and Dravo claimed were caused by Sirrine breaches.

The plaintiffs claimed that Sirrine breaches of duty caused increased quantities of construction materials needed to build the project over the amounts in the fixed-price bid, which was based on design and technical information provided by Sirrine. The court concluded that quantities of various materials increased dramatically over the bid quantities; that a part of the increase was attributable to bid errors made by Weyher/Livsey estimators, but that the majority of the increase was attributable to Sirrine breaches of its duties under the joint venture agreement.

The court considered evidence of the increased construction material quantities and noted that in compiling evidence of quantity increases over the bid amounts, the plaintiffs avoided claiming damages caused by Weyher/Livsey's own bid errors by retaining experts to re-estimate and re-bid portions of the project in order to establish the quantity amounts which should have been bid by Weyher/Livsey

based on the information available at the time of the original bid. The re-estimated bid amounts were then compared to the quantity amounts in Sirrine's post-bid detailed released for construction drawings to determine the increase in material quantities. The court further noted that the evidence presented excluded any quantity increases resulting from field changes, purchasing errors, change orders, or other post-bid design changes required by the Navy. The trial court concluded that "[c]omparing the re-estimates to the released for construction drawings reveals that the Project grew from what reasonably could have been estimated by experienced estimators with engineering experience (as represented by the re-estimate) and what Sirrine designed into the job (as revealed by the released for construction drawings)."

In total, the court found the evidence showed quantity increases costing the plaintiffs $6,417,086 in additional materials and labor, none of which was attributable to bidding errors of Weyher/Livsey. The court further found "that Weyher/Livsey was overconfident in its ability to bid the Project and therefore Sirrine is not completely responsible for the quantity growth over a reasonable, should have been bid estimate. Weyher/Livsey or others are responsible for approximately 40% of these losses." We conclude this means the trial court found that in addition to Weyher/Livsey bid errors, which were eliminated from the $6,417,086 in damages claimed, post-bid actions by Weyher/Livsey or others were responsible for 40 percent of the claimed quantity growth damages and breaches of duty by Sirrine caused the remaining 60 percent of the claimed quantity growth damage in the amount of $3,850,252.

The trial court found the evidence showed the plaintiffs incurred costs of $671,202 for disruption and loss of labor productivity caused by quantity growth in the electrical and piping area, lack of prompt notice from Sirrine of such growth, and Sirrine's crowded piping design. The court found that, because of breaches of its contractual and fiduciary duties, Sirrine caused this disruption damage.

The trial court concluded that the end date of the project was delayed 91 days because of Sirrine's failure to give timely notice of quantity growth, Sirrine's late issue of released for construction drawings, and increased material quantities Sirrine designed to be installed into the project. Additionally, the court found another 102 day delay was caused by Sirrine design error. The plaintiff's costs attributable to the delays were $1,944,700 and the court concluded the evidence showed that breaches by Sirrine caused 80 percent of the costs associated with the delays in the amount of $1,555,760.

With respect to additional costs incurred for certain backcharges and Navy punchlist items, the trial court concluded Sirrine breaches caused 50 percent of the $1,442,535 in backcharges claimed (amount-

ing to $721,267) and all of the punchlist items in the amount of $1,111,751.

The plaintiffs also claimed that due to Sirrine breaches they incurred additional costs for re-design ($489,845), software corrections ($430,000), and payments to obtain as-built drawings ($73,500), for a total cost of $993,345. The court concluded that Sirrine was "partially liable for these costs."

After totaling the amount of damages the court found were caused by Sirrine breaches in each claimed area, the trial court then reduced the total amount to account for unspecified risks assumed by Weyher/Livsey and determined that Sirrine breaches caused damage to Weyher/Livsey and Dravo in the total sum of $5,518,812.

In Case No. A94A0892, Sirrine appeals from the trial court's judgment. Dravo and Weyher/Livsey cross-appeal in Case No. A94A0893.

1. In its first enumeration of error, Sirrine claims the trial judge erred by imposing time limits on the time it had to present its case and cross-examine witnesses. This action was tried in a bench trial for seven weeks in the Complex Civil Litigation Division of the Fulton County Superior Court. The pre-trial order, over 500 pages in length, listed more than 2,500 documentary exhibits subject to being tendered at trial (over 1,000 by the plaintiffs and almost 1,500 by the defendant) and over 130 witnesses which the parties indicated they would or might call to testify (83 by the plaintiffs and 53 by the defendant). By defense estimates, millions of pages of documents were produced during extensive pre-trial discovery. Suffice it to say, the case was complex and the record voluminous.

In the pre-trial order, which contemplated a jury rather than a bench trial, the parties gave a joint estimate that the case would take five weeks to try. The bench trial commenced on April 19, 1993 and was tried Monday through Thursday of each succeeding week. On May 11 the trial had proceeded for over three weeks and the plaintiffs were still presenting their case. The defendant had conducted extensive cross-examination of witnesses equaling or exceeding the time spent by the plaintiffs on direct examination. After a noon break, the trial judge stated for the record that he had been informed by plaintiffs' counsel that their case would take another two weeks to conclude and that defense counsel had informed him Sirrine would thereafter require another four weeks to present its defense.

The trial court ordered that plaintiffs' case was to be concluded by the end of the trial day on May 17, at which time defendant's case would commence and be concluded on June 3. The trial court also ruled that a time limit would be imposed on all parties for the cross-examination of witnesses for the remainder of the trial and suggested that cross-examination be limited to a maximum of four hours per

witness. The trial judge then inquired as to whether trial counsel agreed to the limitations. No objection was made by plaintiffs' counsel to any of the time limitations. As to the four-hour limitation on cross-examination, defense counsel responded, "That's fine with me, your honor." As to the time limitation for presentation of Sirrine's defense, defense counsel stated, "We will do, obviously, the very best job we can to present our case within the time allowed. Without knowing right now whether or not that will enable us to put it on exactly in the way that we feel like it's most effective, I feel like I have to object to that portion of the court's ruling limiting our time to those days." The trial judge responded, "That's fair," and the trial proceeded.

Since defense counsel agreed to the time limitation for cross-examination suggested by the trial judge, the enumeration of error as to this limitation presents nothing for our review. *Hightower v. McIntyre*, 170 Ga. App. 269, 270 (316 SE2d 849) (1984).

In *Newton Commonwealth Property v. G + H Montage*, 261 Ga. 269, 270 (404 SE2d 551) (1991), the Supreme Court held that imposing a time limit on the trial of a complex case was reversible error where it had "the effect of prejudicing the parties and preventing a full and meaningful presentation of the merits of the case." In *Intl. Assn. of Machinists v. Street*, 215 Ga. 27, 40 (108 SE2d 796) (1959), reversed on other grounds, 367 U. S. 740 (81 SC 1784, 6 LE2d 1141) (1961), the Supreme Court addressed defense counsel's claim that the trial judge's "hasty procedure deprived them of their right to make a proper and adequate defense." The Court stated that "[i]f the legal rights of the parties are not prejudiced or denied, this court will not interfere with the discretion of the trial court in matters of practice in the hearing and disposition of causes before it unless this discretionary power has been exercised in an illegal, unjust, or arbitrary manner." Id.

The trial court "has inherent power to control the course of the trial . . ." (*Carmichael v. Carmichael*, 248 Ga. 216, 218 (282 SE2d 71) (1981)) and the procedural rules governing trials are "construed to secure the just, speedy, and inexpensive determination of every action." OCGA § 9-11-1. Obviously, parties are not entitled to present their cases ad infinitum but neither may the trial court impose limits on the trial of the case which have the effect of excluding relevant, non-cumulative evidence simply because it delays the conclusion of the trial. However, trial courts do have the discretion to exclude relevant evidence " 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Hicks v. State*, 256 Ga. 715, 720 (352 SE2d 762) (1987).

The trial court did not explain its rationale for imposition of the time limits. However, we need not determine in this case whether the trial court had the discretion to impose such limits and, if so, whether or not that discretion was properly exercised.[1] Even assuming the imposition of the trial time limit was error, Sirrine must demonstrate harm resulting from the error. Although defense counsel objected to the time limit imposed on the presentation of Sirrine's case, the basis for the objection was not that the time limit would necessarily prejudice the defense or result in the exclusion of relevant evidence. Rather, the objection was conditioned by counsel's statement that he did not know at the time whether or not the time limit would allow for a full and fair presentation of the defense. By responding, "That's fair," the trial court did not overrule the objection and indicate the time limit would be inflexibly applied, but indicated a willingness to consider any subsequent showing that the time limit would prejudice the defense. The record shows Sirrine made no further objection that the trial time limit actually had the effect of prejudicing the defense nor at any time during the trial did Sirrine make an offer of proof of any evidence that the time limit prevented it from introducing. In the absence of any such offer of proof, we find no basis to conclude that the time limit prejudiced Sirrine. *Griffin v. Henderson*, 117 Ga. 382, 383 (43 SE 712) (1903) (to preserve claimed error for appellate review, it must appear the excluded evidence was material and that it was expressly called to the attention of the trial court at the time of its exclusion); *Money v. Daniel*, 188 Ga. App. 215, 217 (372 SE2d 305) (1988).

2. A substantial portion of the damages claimed by Dravo and Weyher/Livsey against Sirrine resulted from the fact that the quantities of construction materials needed to build the project greatly exceeded the estimates for construction materials on which the joint venture's fixed-price bid was based. In its second enumeration of error, Sirrine claims that section 9.3 of the joint venture agreement unambiguously released Sirrine from any responsibility for damages resulting from increases in construction material quantities and that the trial court erred in failing to enforce section 9.3 to shield Sirrine

---

[1] It appears that most jurisdictions considering the issue have found trial courts have the discretion to set reasonable trial time limits in protracted cases to prevent needless delay or waste of time, as long as the limits are not arbitrary, do not exclude probative, non-cumulative evidence simply because its introduction will extend the case, and the limits are sufficiently flexible to accommodate adjustment if it appears the court's initial assessment would prejudice a party by preventing a fair presentation of the merits of the case. See *MCI Communications Corp. v. American Tel. &c. Co.*, 708 F2d 1081, 1171 (7th Cir. 1983); *Johnson v. Ashby*, 808 F2d 676, 678 (8th Cir. 1987); *Secretary of Labor v. DeSisto*, 929 F2d 789, 794-796 (1st Cir. 1991); *Flaminio v. Honda Motor Co.*, 733 F2d 463, 473 (7th Cir. 1984); *United States v. Reaves*, 636 FSupp. 1575 (E.D. Ky. 1986); *Varnum v. Varnum*, 586 A2d 1107, 1114-1115 (Vt. 1990).

from any such claims.

Article 9 of the joint venture agreement, which dealt with Sirrine engineering errors, provided as follows: "9.1 Notwithstanding Article 8.2, Sirrine shall not be liable to W/L [Weyher/Livsey] or Dravo for any increase in the direct cost to W/L and Dravo to perform their respective scopes of work resulting from Sirrine's engineering errors and omissions detected by Sirrine and noticed to W/L and Dravo or detected by W/L and Dravo prior to W/L's or Dravo's expenditure of any costs in the performance of their work in reliance thereon.

"9.2 Notwithstanding Article 8.2, Sirrine shall not be liable to W/L or Dravo for any increase in the direct cost to W/L and Dravo to perform their respective scopes of work resulting from Sirrine's engineering errors and omissions detected by Sirrine and noticed to W/L and Dravo subsequent to W/L's or Dravo's expenditure of any costs in the performance of their work in reliance thereon up to a cumulative maximum cost to W/L and Dravo of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00); over and above which Sirrine shall be liable to W/L and Dravo for any such increase in the direct cost to W/L and Dravo to perform their respective scopes of work resulting from Sirrine engineering errors that become apparent subsequent to W/L's or Dravo's expenditure of any costs in the performance of their work in reliance thereon.

"9.3 Notwithstanding any of the forgoing, Sirrine shall have no risk, liability, or accumulation will occur of error and omission charges for construction material quantity variations if the actual quantities are different from those in the bid to the Navy. W/L will provide Sirrine with budget quantities for all functional areas of Project and Sirrine's detail design will make every reasonable effort to stay within these quantities within the requirements of the Prime Contract. W/L will be notified promptly if Sirrine believes quantities will be exceeded."

Article 8 of the joint venture agreement dealt with performance of and responsibility for work. In section 8.1 each party agreed to perform its individual scope of work as set forth in Article 6. Section 8.2 provided that, unless provided otherwise in Article 9, each party accepted full responsibility for its scope of work and would indemnify the others for damages resulting from untimely, defective or non-conforming work. Section 8.3 provided that Sirrine's liability under the joint venture agreement was limited to liabilities arising out of its scope of work specified in Article 6. In Article 6, which defined the scope of each party's work, Sirrine's design and engineering responsibilities were set forth. Section 2.1 of the joint venture agreement, which dealt with the pre-bid work of the parties, provided that: "In the event the Joint Venture is awarded the Prime Contract, Sirrine will be compensated for its costs and expenses . . . pursuant to Arti-

cle 11 incurred in making any proposal and the pursuit of the Project up through and including the execution of the Prime Contract, all of which shall be deemed part of Sirrine's original scope of work specified in Article 6 and therefore shall be deemed a cost in determining Sirrine's costs of performing its scope of work for purposes of . . . incentive compensation."

The joint venture agreement further provided that it was the entire agreement of the parties; that all prior written and oral agreements were terminated and merged into the joint venture agreement, and that the agreement shall be interpreted according to the laws of Virginia.

The trial court ruled that section 9.3 was ambiguous and concluded it was not the intent of the parties that the section relieve Sirrine of all responsibility for damages resulting from increases in construction material quantities caused by any errors or omissions in Sirrine's work.[2]

Under Virginia law, "[a]scertainment of the intent of the contracting parties is the cardinal rule in the construction of agreements. To do that the court will put itself in the situation occupied by the parties and look to the language employed, the subject matter and purpose of the parties, and all other pertinent circumstances. Occupying that status, it will apply the language used to the subject matter and object sought to be accomplished and so judge and determine its meaning." (Citations and punctuation omitted.) *Paul v. Paul*, 203 SE2d 123, 125 (Va. 1974). See *Town of Ashland v. Newman*, 175 SE 724, 726-727 (Va. 1934). "[W]here an agreement is complete on its face, [and] is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." (Citation and punctuation omitted.) *Ross v. Craw*, 343 SE2d 312, 316 (Va. 1986). However, "when ambiguous contractual provisions are at issue, extrinsic evidence is available to discern the intention of the parties." *Dart Drug Corp. v. Nicholakos*, 277 SE2d 155, 157 (Va. 1981). "An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time." *Renner Plumbing &c. v. Renner*, 303 SE2d 894, 898 (Va. 1983). Whether or not a contract is ambiguous is a question of law for the court. *Wilson v. Holyfield*, 313 SE2d 396, 398 (Va. 1984).

The first sentence of section 9.3 is ambiguous on its face. In view of the language of section 9.3, other provisions in the joint venture agreement, the circumstances of the agreement, and extrinsic evi-

---

[2] Although the trial court does not explicitly state that it applied Virginia law to interpret the contract, we will enforce the parties' contractual choice of Virginia law to interpret the provisions of the joint venture agreement. *Kinnick v. Textron Fin. Corp.*, 205 Ga. App. 429 (422 SE2d 303) (1992).

dence bearing on the intent of the parties, we agree with the trial court's conclusion that section 9.3 is ambiguous and cannot be interpreted as shielding Sirrine from all responsibility for increases in construction material quantities even if such increases were caused by errors or omissions in Sirrine's pre-bid or post-bid design and engineering work.

Under Article 8 of the joint venture agreement, the parties agreed to accept responsibility for their own scope of the work. Article 6 and section 2.1 of Article 2 make clear that the scope of Sirrine's work encompassed design and engineering responsibilities in both the pre-bid pursuit of the project and the post-bid construction of the project. The purpose of section 9.2 was to provide that, notwithstanding the responsibilities undertaken by Sirrine in section 8.2 for the scope of its work, Sirrine was not liable for the first $750,000 in damages resulting from engineering errors and omissions detected by Sirrine and noticed to Weyher/Livsey and Dravo after they relied upon and incurred damages as a result of the errors.[3] In effect, this section provided for a $750,000 deductible on damage claims against Sirrine for errors in its design and engineering work.[4]

There was also extrinsic evidence found credible by the trial court bearing on the intent of the parties. The trial court noted that a Sirrine official admitted that it was not Sirrine's intention to shield itself from all liability regardless of the quality of the work it performed. See *Algernon Blair, Inc. v. Norfolk Redevelopment &c.*, 108 SE2d 259, 262 (Va. 1959) (interpretation of parties entitled to great weight in construing an ambiguous "no damage" clause in a construction contract).

Considering the language and purpose of the joint venture agreement and other evidence of the parties' intention, the trial court concluded that under section 9.3 the parties intended that the risk construction material quantities used to build the project would exceed the amounts estimated in the bid were divided between Sirrine and Weyher/Livsey. As to the pre-bid phase of the project, design and engineering work was done by Sirrine and the estimating and bid preparation was done by Weyher/Livsey based on Sirrine's work and other technical information provided by Sirrine in support of the bid. The intent of section 9.3 was that Weyher/Livsey, and not Sirrine, should bear responsibility for damages caused by Weyher/Livsey's own errors in estimating and bid preparation and that Sirrine should remain re-

---

[3] We do not deal with Sirrine errors detected and noticed prior to reliance thereon as contemplated in section 9.1.

[4] Ultimately, the trial court determined that Sirrine did not provide Weyher/Livsey or Dravo the required notice of errors and omissions under section 9.2 and ruled that the deductible did not apply.

sponsible for damage resulting from its pre-bid design and engineering errors. As to the post-bid construction phase of the project, the trial court noted that the last two sentences of section 9.3 "imposed affirmative obligations upon Sirrine to (i) make every reasonable effort with its detailed design to stay within budgeted quantities for all functional areas of the Project within the requirements of the contract with the Navy and (ii) notify Weyher/Livsey promptly if Sirrine believes quantities will be exceeded."

Applying Virginia law, we find the trial court's conclusions as to section 9.3 to be a reasonable and just interpretation of the intention of the parties.[5]

3. In their first enumeration of error on cross-appeal, Weyher/Livsey and Dravo contend the trial court erred by failing to award them pre-judgment interest because the joint venture agreement provides that each party will indemnify the other for "all loss, costs, expenses, and damages (including but not limited to liquidated, special, indirect, and consequential damages) resulting from such Party's performance of its scope of work in an untimely, defective, or manner that is non-conforming with the Prime Contract."

We find no error in the trial court's failure to award pre-judgment interest in this case. Weyher/Livsey and Dravo cite no Virginia law in support of their contention that the language in the joint venture agreement should be construed as an agreement that pre-judgment interest would apply to the present claims. Based on our determination in Division 2 that Virginia law applies to interpretation of the agreement, absent a contrary showing, we will presume the trial court properly determined there was no agreement between the parties as to pre-judgment interest. See *Kinnick v. Textron Fin. Corp.*, 205 Ga. App. 429, 430 (422 SE2d 303) (1992). Since the damages sought in this case were unliquidated (see *Nisbet v. Lawson*, 1 Ga. 275, 287 (1846)), any pre-judgment interest awardable was governed by OCGA § 13-6-13. *Braner v. Southern Trust Ins. Co.*, 255 Ga. 117, 119-120 (335 SE2d 547) (1985); *Tower Financial Svcs. v. Smith*, 204 Ga. App. 910, 917-918 (423 SE2d 257) (1992); *Bishop Contracting Co. v. North Ga. Equip. Co.*, 203 Ga. App. 655, 656-657 (417 SE2d 400) (1992). Thus, the award of pre-judgment interest was in the discretion of the trial judge as the trier of fact in this bench trial. *PDA, Inc. v. Haas Corp.*, 185 Ga. App. 785, 787 (366 SE2d 169) (1988); *Typo-Repro Svcs. v. Bishop*, 188 Ga. App. 576, 579-580 (373 SE2d 758) (1988). We find no abuse of discretion.

4. All the parties take issue with the trial court's determination of

---

[5] Without giving specifics, the trial court also based its conclusion on public policy concerning exculpatory clauses. We need not address this additional basis since we have determined that the court's interpretation of section 9.3 was correct for other reasons.

damages. In their second enumeration of error on cross-appeal, Weyher/Livsey and Dravo claim the trial court improperly reduced the damages for which Sirrine was responsible. In its third enumeration of error, Sirrine claims the judgment for damages, except as to damages for backcharges and punchlist work, must be reversed because there was no basis for the court's determination that Sirrine, rather than others, caused such damages.

In its order and judgment in the case, the trial court stated that it determined the amount of the claimed damages that were caused by Sirrine's breach of its contractual and fiduciary duties by "determining what portion of each damage area was caused by actions of Sirrine" and totaling those amounts. The trial court previously concluded in its order that breaches by Sirrine caused: (1) 60 percent of the quantity growth costs in the amount of $3,850,252; (2) all of the disruption costs in the amount of $671,202; (3) 80 percent of the delay costs in the amount of $1,555,760; (4) 50 percent of the backcharges in the amount of $721,267, and (5) all of the punchlist items in the amount of $1,111,751. These amounts total $7,910,232 in damages which the trial court found were caused by Sirrine breaches. In addition to this amount, the trial court found that Sirrine breaches caused part of another $993,345 in claimed damages for re-design, software corrections, and additional drawings.

The trial court stated that after totaling the amount of the damages it determined were caused by Sirrine breaches of duty, it discounted the final number "to account for risks that Weyher/Livsey assumed during or through the bid and construction process" and determined that "Sirrine breaches of its contractual and fiduciary obligations damaged Weyher/Livsey and Dravo in the cumulative amount of $5,518,812." Regardless of what portion of the last $993,345 in claimed damages the court determined were caused by Sirrine breaches, it is clear that the trial court determined that breaches by Sirrine caused more than $7,910,232 in damages to the plaintiffs. The reduction of the judgment amount by at least 30 percent to $5,518,812 to account for risks assumed by Weyher/Livsey cannot be reconciled with the court's previous determination that more than $7,910,232 in damages were caused by Sirrine breaches of its contractual and fiduciary duties. Obviously, the plaintiffs did not assume the risk that Sirrine would breach its duties to them under the joint venture agreement. It appears that the reduction for "risks that Weyher/Livsey assumed during or through the bid and construction process" indicates the trial court also found that a significant portion of the damage at issue was caused by factors in the bid and construction process other than breaches of the joint venture agreement by Sirrine. Nevertheless, it was inconsistent and erroneous for the trial court to account for these other causal factors by reducing damages it had al-

ready concluded were caused by Sirrine breaches.

"In a bench trial the court sits as the trier of fact and his findings shall not be set aside unless clearly erroneous. OCGA § 9-11-52 (a). The clearly erroneous test is the same as the any evidence rule. Thus, an appellate court will not disturb fact findings of a trial court if there is any evidence to sustain them." (Citations and punctuation omitted.) *Parking Co. of America v. Sucan*, 195 Ga. App. 616, 617 (394 SE2d 411) (1990). However, the court's judgment in a non-jury trial will be reversed where it is apparent that it rests on erroneous reasoning or on an erroneous legal theory. *Scott v. Purser Truck Sales*, 198 Ga. App. 611, 612 (402 SE2d 354) (1991); *Ayers v. Yancey Bros. Co.*, 141 Ga. App. 358, 361 (233 SE2d 471) (1977).

Since we are unable to reconcile these inconsistent findings in the court's order, we cannot determine the amount of damages the trial court concluded was caused by Sirrine breaches of its contractual and fiduciary duties. We will not speculate whether or not the trial court intended to modify its previous conclusions with respect to Sirrine's liability for some or all of the various types of damages claimed. Until the trial court clarifies its conclusions as to the damage it found was caused by Sirrine breaches, as opposed to damages caused by other factors, we are unable to fully review Sirrine's claim that there was no rational basis for the trial court to apportion the damages and conclude that Sirrine breaches, rather than other factors, caused the damages awarded in the judgment.[6] Accordingly, we reverse the judgment and remand the case for the trial court to clarify its judgment on the above damage issues and enter a new judgment in accordance with this opinion. The right of any party to appeal from the entry of a new judgment is preserved.

5. The judgment of the trial court is affirmed as to the issues addressed in Divisions 1, 2, and 3, supra. We need not address enumerations of error 3 and 4 in the cross-appeal of Dravo and Weyher/Livsey.

*Judgments affirmed in part and reversed in part and case remanded with directions. Beasley, P. J., and Johnson, J., concur.*

---

[6] In a contract claim where multiple causes contribute to damages, the plaintiff bears the burden of demonstrating a reasonable basis for determining that the damages sought were caused by the defendant's breach of the contract. See *Crawford & Assoc. v. Groves-Keen, Inc.*, 127 Ga. App. 646, 650 (194 SE2d 499) (1972); *Turner v. Connor*, 192 Ga. App. 348, 349 (385 SE2d 19) (1989); *Ayers v. John B. Daniel Co.*, 35 Ga. App. 511, 513-514 (133 SE 878) (1926); *Pottinger v. Cross*, 170 Ga. App. 647, 649-650 (317 SE2d 850) (1984); *Tri-State Systems v. Village Outlet Stores*, 135 Ga. App. 81, 85 (217 SE2d 399) (1975). Damages may be apportioned according to degree of responsibility when there is a reasonable basis to support the trier of fact's determination that the portion of the damages awarded against the defendant was caused by the defendant's breach of contract. *Rome Housing Auth. v. Allied Bldg. Materials*, 182 Ga. App. 233, 239 (355 SE2d 747) (1987).

DECIDED JUNE 16, 1994 —
RECONSIDERATION DENIED JUNE 29, 1994 — 

*Gleaton, Scofield, Egan & Jones, M. Michael Egan, Jr., Heiskell, Donelson, Bearman, Adams, Williams & Caldwell, Thomas O. Helton,* for appellant.

*Jones, Day, Reavis & Pogue, Gregory R. Hanthorn, John H. Williamson,* for appellees.