A98A0052. LANCASTER v. USAA CASUALTY INSURANCE COMPANY.
(502 SE2d 752)

ANDREWS, Chief Judge.

Suzanne Lancaster, insured by USAA Casualty Insurance Company (USAA), appeals from the trial court's judgment in favor of USAA in her suit for bad faith cancellation of benefits. The matter was heard by the court sitting without a jury.

1. " 'In a bench trial the court sits as the trier of fact and his findings shall not be set aside unless clearly erroneous. OCGA § 9-11-52 (a). The clearly erroneous test is the same as the any evidence rule. Thus, an appellate court will not disturb fact findings of a trial court if there is any evidence to sustain them.' (Citations and punctuation omitted.) *Parking Co. of America v. Sucan*, 195 Ga. App. 616, 617 (394 SE2d 411) (1990). However, the court's judgment in a non-jury trial will be reversed where it is apparent that it rests on erroneous reasoning or an erroneous legal theory. *Scott v. Purser Truck Sales*, 198 Ga. App. 611, 612 (402 SE2d 354) (1991); [cit.]." *CRS Sirrine v. Dravo Corp.*, 213 Ga. App. 710, 721 (4) (445 SE2d 782) (1994).

2. Viewed with all inferences in favor of the judgment, the evi-

dence was that Lancaster[1] was involved in an automobile accident on July 10, 1993, in which her vehicle sustained a glancing blow from the rear. She was taken to an emergency room complaining of head, neck and back pain. The emergency room doctor diagnosed muscle strain and recommended she see a neurologist, which she did. Her neurologist, Dr. Lesch, treated her until November 1993, when, according to Lancaster, she suffered unusual swelling which Dr. Lesch did not know how to treat and he referred her to a rheumatologist at Emory.

Lancaster testified that she had been diagnosed by Emory physicians in 1988 with fibromyalgia, a form of rheumatoid arthritis, which had been controlled with medication until the accident. Lancaster also testified that, after being referred back to Emory by Dr. Lesch, her rheumatologist treated her with muscle relaxers and anti-inflammatories and referred her to a psychiatrist for depression from the fibromyalgia, as well as an internist, and a cardiologist. No reasons appear in the record or transcript for the latter two referrals.

USAA's policy had medical coverage up to $50,000 and lost wages coverage of up to $2,000 a month for two years. USAA paid medicals of $11,595 and lost wages of $14,988 before stopping the payments in August 1994, after obtaining an independent medical examination by neurologist Dr. David Cohen in May 1994. The independent medical exam was requested because it appeared that Lancaster was not getting any better with the treatment being received and the adjuster felt a second opinion would be useful to both parties. A neurologist was chosen for the independent exam because the adjuster believed Lancaster was mainly being treated by a neurologist at that time.

Dr. Cohen was chosen by Florida Medical Specialists, an independent entity used by USAA for medical exams, to do the exam after Lancaster objected that the first neurologist chosen was located inconveniently for her. Dr. Cohen was provided with Dr. Lesch's records as well as the accident report and the emergency room records. He performed an examination of Lancaster and concluded that "[i]n my field of speciality, no further neurological treatment is reasonable or necessary . . . relative to the accident in question[,]" and that "the patient is able to work in a full time job without restrictions or limitations . . . [and] this patient has reached maximal medical benefit in my speciality and I do not feel that further treatment is necessary."

---

[1] Lancaster had served as an emergency medical technician for three years and was performing abbreviated physical examinations for life insurance applicants at the time of the wreck.

Based on his report, USAA ceased paying benefits on August 11, 1994.

3. "'As a matter of law, bad faith penalties [and attorney fees] under [OCGA § 33-4-6] are not awardable if an insurer has a reasonable and probable cause for refusing to pay a claim. The advice of an independent medical examiner that the treatment furnished a claimant is not in fact necessary [treatment for injuries arising from the accident covered by the insurance policy], *unless patently wrong* based on facts timely brought to the insurer's attention, provides a reasonable basis for an insurer's denial of a claim for payment for such treatment.' *Haezebrouck v. State Farm Mut. Auto. Ins. Co.*, 216 Ga. App. 809, 811 (455 SE2d 842) (1995); *Colonial Life &c. Ins. Co. v. Donaldson*, 172 Ga. App. 211, 212-213 (322 SE2d 510) (1984)." (Emphasis supplied.) *Jones v. State Farm &c. Ins. Co.*, 228 Ga. App. 347, 351 (3) (491 SE2d 830) (1997).

Here, since USAA obtained the opinion of Dr. Cohen that no further neurological treatment was needed, it was incumbent upon Lancaster to show the court, by a preponderance of evidence, that this opinion was patently wrong and that the worsening of her fibromyalgia was attributable to the accident. This she contends she did by virtue of her own testimony and the introduction of her continuing medical bills pursuant to OCGA § 24-7-9 and *Hutcheson v. Daniels*, 224 Ga. App. 560, 561 (1) (481 SE2d 567) (1997).

(a) While there are situations, such as *Hutcheson*, where we have concluded that expert testimony was not necessary to prove causation of an injury because of the short lapse of time between automobile accidents and treatment for a neck injury or carpal tunnel which the plaintiffs attributed to the accident, this is not such a situation. *Hutcheson* involved the onset of previously unexperienced carpal tunnel pain within days of an accident and resulting treatment. There, as in *Madden v. Solomon*, 196 Ga. App. 512, 513 (1) (396 SE2d 245) (1990) (physical precedent) (neck injury manifested within hours of collision) and *Jordan v. Smoot*, 191 Ga. App. 74 (1) (380 SE2d 714) (1989) (head, neck and back pain shortly after collision), we found that a lay jury could conclude there was a causal connection as a matter of common sense based on the plaintiff's testimony and medical bills. Here, the issue is not the neck, back and knee pain which Lancaster initially suffered, but aggravation of another condition, fibromyalgia.

The present situation is more similar to that in *Eberhart v. Morris Brown College*, 181 Ga. App. 516, 517 (1) (352 SE2d 832) (1987). There, a former college football player sued the college several years after leaving, contending that his continuing medical problems were attributable to injuries suffered while playing for the college. Although his medical bills were admissible under OCGA § 24-7-9

without having the person submitting the bill testify and without having to produce an expert to show the charges were reasonable and necessary, *Eberhart,* supra, "OCGA § 24-7-9 is only a statutory rule of evidence regarding the admission of medical bills. It does not purport to obviate a plaintiff's further satisfaction of the evidentiary obligation to demonstrate the liability of the defendant for the damages being sought. Notwithstanding the admission into evidence of medical bills, a plaintiff must still prove that his injury is within the coverage of the policy of insurance under which a recovery is sought. [Cit.]" Id. at 518.

While Dr. Cohen did not dispute that Lancaster had fibromyalgia or that an automobile accident might cause fibromyalgia to flare, that alone does not suffice to prove the causation required to tie the accident to Lancaster's continuing problems and treatment by physicians other than a neurologist. Compare *Wright v. Millines,* 217 Ga. App. 464 (458 SE2d 488) (1995) (referring physician's testimony that he referred patient to an orthopedist provided causal link between injuries and orthopedic surgery). Here, the connection between flaring fibromyalgia and the accident is not the type of common sense deduction that lay factfinders have been found competent to make. *Eberhart,* supra at 518.

(b) There is also another evidentiary barrier to Lancaster's claim — hearsay. While Lancaster could testify to her physical condition and the treatment she obtained for it, the only link between the accident and this continuing treatment was Lancaster's testimony concerning Dr. Lesch's[2] statements to her that he did not know what caused her swelling and that he was referring her to Emory for further treatment by a rheumatologist.

" '[H]earsay testimony is not only inadmissible but wholly without probative value, and its introduction without objection does not give it any weight or force whatever in establishing a fact.' *Higgins v. Trentham,* 186 Ga. 264 (1) (197 SE 862) (1938)." *White Missionary Baptist Church v. Trustees of First Baptist Church &c.,* 268 Ga. 668, 669 (1) (492 SE2d 661) (1997). Therefore, we do not consider the hearsay statements repeated by Lancaster regarding what doctors told her about the diagnosis and causation of her condition and the referrals made by these doctors. Compare *Southern Medical Corp. v. Liberty Mut. Ins. Co.,* 216 Ga. App. 289, 291 (2) (454 SE2d 180) (1995) with *Cox v. Rewis,* 207 Ga. App. 832, 833 (429 SE2d 314) (1993).

4. Under these circumstances, the trial court's conclusions that Lancaster had not carried her burden of proof and that USAA's defense of an independent medical examination as the basis for

---

[2] USAA paid the expenses incurred in treatment by Dr. Lesch.

refusing continued payment was reasonable as a matter of law are affirmed. *Neal v. Superior Ins. Co.*, 208 Ga. App. 827 (432 SE2d 253) (1993).

*Judgment affirmed. Blackburn, J., concurs and concurs specially. Eldridge, J., concurs in the judgment only.*

BLACKBURN, Judge, concurring and concurring specially.

I fully concur with the analysis and holding of the majority in this case. While I do not question the holdings of the trial judge or the opinion of Dr. Cohen in this matter, I write separately to point out a systemic problem in the general use of "independent" experts in the litigation process. This problem, while not limited thereto, is greatest where insurance companies use "independent" medical experts' opinions to deny or limit payment of claims. The inherent weakness of this process is that the insurance company which controls the flow of business to the "independent" medical services provider has a financial interest in the negative finding of such provider.

Where companies are established for the sole purpose of selecting or providing medical experts for insurance companies, either individually or as an industry, they can by no means be deemed to be independent, unless a major portion of their income is derived from providing medical services or expert testimony on behalf of plaintiffs. Where essentially all of a company's business comes from a single insurance company, from the insurance industry, from providing defense services to the medical profession, or some combination thereof, such companies clearly have a financial interest in providing opinions which are favorable to healthcare or insurance company defendants. If they did not do so, they would soon find themselves without business, as the parties who retain them are advocates seeking partisan advantage. It is not the responsibility of parties to advocate or pay for the production of evidence which will benefit their opponent. It is only natural that defendants and plaintiffs alike will employ only those who support their position under our existing system of expert selection. Parties are free to shop any number of potential experts until they locate one who supports their position. The factfinder is rarely aware of the numerous experts who may have rejected the advocated position. Where the parties are totally free to select and employ an expert, the term "independent expert" becomes an oxymoron. The law has long recognized the natural allegiance one generally has to the one from whom payment is received. In addition, experts are not exempt from normal human frailties, and their position might be affected by the amount of the fee received for services rendered.

Truth is the province of the trial judge and the jury. It is in the search for truth and justice that the trial court has great discretion

in the control of a case. It would seem an appropriate function of the trial judge to inquire into the "independence" of any company which provides or selects "independent" expert services or opinions, be they for plaintiffs or defendants. In the event such inquiry results in a determination of bias in favor of either party by the trial judge, such judge could limit or exclude such evidence, allow the use of another expert under rules imposed by the trial court, or consider such bias in the judge's evaluation of such evidence or charge the jury that it is free to do so where the matter is submitted to a jury.

In considering whether the involved service or expert is "independent" or biased, the trial court could consider the above-listed factors as well as the amount of the fee received. If the subject service does not get a significant portion of its business from both plaintiffs and defendants, such condition would authorize a presumption of bias and dependence and authorize the trial court to act.

It is important that trial courts be fair in the exercise of their discretion and in limiting evidence. Except in the most egregious of cases the trial court should seek to permit the parties to select replacement experts who are truly independent, unbiased experts or services, where bias is found. Such issue must be timely raised by the party asserting expert bias so as not to unduly delay the trial of such case or to result in injustice.

As to those services which do not directly provide expert opinions to either plaintiffs or defendants, but rather select those who do, the trial court could consider whether such services are provided generally to plaintiffs and defendants or insurance companies. Where a company essentially limits its searches to finding experts for one side or the other, the court can conclude that such experts are not independent, and are inclined to render opinions which are consistent with their client's position. The trial court would be free to consider such presumptive bias, whether or not any direct bias by the selected expert can be shown. The trial court can also consider the fees charged by the service or expert, any contingent interest in the subject litigation, the volume of business derived by such providers from either party or the industry of which they are a part.

The trial courts have inherent authority to exercise their discretion in the area of "independent" experts under the existing laws of Georgia, and I would encourage them to fully exercise such authority in appropriate cases.

DECIDED MAY 22, 1998 —
RECONSIDERATION DENIED JUNE 9, 1998.

*Donald J. Sharp*, for appellant.
*Savell & Williams, John C. Parker*, for appellee.