**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 21, 2014**

# In the Court of Appeals of Georgia

A13A2252. FOUCH v. BICKNELL SUPPLY COMPANY et al.        MI-118

MILLER, Judge.

Enrico Fouch was diagnosed with silicosis and ultimately received a double-lung transplant due to his overexposure to silica sand while he worked for approximately 11 years as a sandblaster. Fouch subsequently filed suit against Mine Safety Appliances Company, Bicknell Supply Company, and Miles Supply of Elberton, Inc. (collectively, "the Defendants"), who manufactured or supplied safety equipment that Fouch used while sandblasting.[1] Fouch alleged strict liability for defective design and negligent failure to warn against the Defendants. The trial court granted the Defendants' motions for summary judgment, concluding that Fouch's claims against Mine Safety Appliances or Bicknell Supply failed as a matter of law

---

[1] Other named defendants were dismissed from the case.

because he did not establish that they proximately caused his injuries. Specifically, the trial court found that Fouch failed to present evidence showing the amount of exposure he experienced while using these defendants' products. The trial court also concluded that all of the Defendants were entitled to summary judgment on Fouch's failure-to-warn claim because they did not have a duty to warn Fouch of the known risks associated with sandblasting.[2]

Fouch appeals from the trial court's ruling, contending that the trial court erred in concluding that, in order to establish proximate cause, he was required to show the actual quantity of respirable silica he was exposed to while wearing the Defendants' products. Fouch also contends that the trial court erred in concluding that the Defendants did not have a duty to warn him of the dangers posed by sandblasting. For the reasons that follow, we reverse.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. On appeal from the grant or denial of a motion for summary judgment,

---

[2] Fouch does not challenge the trial court's ruling that Bicknell Supply and Miles Supply were entitled to summary judgment on Fouch's strict liability claim based on design defects. There is no dispute that Miles Supply and Bicknell Supply did not manufacture any of the equipment upon which Fouch's claims are based. Therefore, Bicknell Supply and Miles Supply were entitled to summary judgment on this claim. See OCGA §§ 51-1-11 (b) (1), 51-1-11.1 (a), (b); *Farmex Inc. v. Wainwright*, 269 Ga. 548, 549 (501 SE2d 802) (1998).

we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant.

(Citations, punctuation, and footnote omitted.) *MCG Health, Inc. v. Barton*, 285 Ga. App. 577, 578 (647 SE2d 81) (2007).

So viewed, the evidence shows that Fouch worked as a sandblaster in the granite industry in Elberton, Georgia from 1996 to 2007. During that time, Fouch worked for two companies: Majestic Granite from 1996 to January 1999 and Superior Granite from January 1999 to October 2007.

At Majestic Granite, Greg Dubose taught Fouch how to sandblast and gave limited instruction on what protective gear Fouch could use for sandblasting. According to federal regulations dealing with respiratory protection, the only acceptable respirator to be used during abrasive sandblasting is the Type CE air-supplied respirator with a blast hood or helmet as part of the respirator unit (hereinafter an "air-supplied hood"). Dubose did not instruct Fouch that it was necessary to sandblast in an air-supplied hood, and neither of them used an air-supplied hood while sandblasting. Instead, Fouch and Dubose sandblasted while using a non-air-supplied canvas hood and either a paper mask or an air-supplied respirator underneath the hood. Every time Fouch sandblasted in an enclosed

3

sandblasting room, he wore the non-air-supplied hood and an air-supplied respirator. Fouch knew that it was harmful to inhale the dust caused from sandblasting and that he had to wear respiratory equipment to protect against this hazard. Fouch stated that, while at Majestic Granite, the respirator he used was cleaned only a few times and he was never given an air-supplied hood.

At Majestic Granite, Fouch used several different types of sand, and he remembered seeing warning labels on the front of those bags about the need to avoid inhalation of the dust caused by sandblasting. Fouch, however, did not remember reading the language contained in those warning labels that prolonged exposure to crystal and silica had been shown to induce silicosis.[3]

---

[3] The warnings stated:

WARNING
LUNG HAZARD

Use of this product especially for sandblasting requires the use of [Mine Safety Health Administration ("MSHA")/National Institute for Occupational Safety and Health ("NIOSH")] approved continuous flow [Type-CE air-supplied hood] in accordance with Federal OSHA regulations contained in 29 CFR 1910.94. All persons associated with sandblasting operations must be adequately trained in the use of, and provided with the appropriate respirator to prevent prolonged inhalation of crystalline silica in excess of the limits set in 29 CFR 1910.1000.

Prolonged exposure to crystalline silica has been shown to induce silicosis. . . .

Majestic Granite purchased its respiratory equipment, including the-non-air-supplied hoods, and sand from Miles Supply. The canvas hood contained a warning label advising that the hood did not provide respiratory protection, and only NIOSH-approved respirators should be used when sandblasting. Majestic Granite also purchased sand and equipment, including canvas hoods, from Bicknell Supply. and Majestic Granite had a Dustfoe 66 respirator, which was manufactured by Mine Safety Appliances. The record contains no evidence of any discussions about what equipment Majestic Granite should purchase.

In January 1999, Fouch left Majestic Granite and began working for Superior Granite. Superior Granite provided Fouch with various types of respiratory protection – a paper dust mask, a non-air-supplied hood, an air-supplied respirator, and a non-air-supplied respirator. At first, Fouch used an air-supplied respirator, but subsequently he refused to wear it because the air flowing into the mask stung his eyes and smelled bad. When confronted by his supervisor, Charles Worley, Jr., Fouch explained his reasons for not wearing the mask, and Charles Worley offered to buy a new respirator and instructed Fouch to select one from a catalogue. Around the same time, Superior Granite asked Fouch to sign a "Waiver of Responsibility," indicating that he understood that exposure to sandblasting dust could be harmful to

5

his health, the failure to wear respiratory protection could cause illness, that the equipment provided by Superior Granite would provide adequate protection, and he would hold Superior Granite harmless for his decision not to wear the equipment provided.

Fouch then selected and Charles Worley bought for Fouch a Dustfoe 66 respirator. Charles Worley believed that he first contacted Bicknell Supply to purchase the respirator, and when they did not have it, he went to Miles Supply. The Dustfoe 66 was later replaced with another unit and then with a Dustfoe 88 respirator. Eventually, Superior Granite replaced the Dustfoe 88 respirator with an air-supplied respirator.

Fouch used the Dustfoe respirators primarily for sandblasting, but he also used the Dustfoe during cleanup, shoveling, and sweeping of sand. Fouch wore three different Dustfoe respirators for a total period of approximately two years at Superior Granite. The Dustfoe respirators were not air-supplied, nor did they contain warnings that they were unfit for use in sandblasting.

Charles Worley had told Fouch of the dangers of sandblasting, and Worley testified that sandblasting with silica sand would not be a problem if the sandblaster wore respiratory protection, which, according to him, amounted to an air-supplied

6

respirator and a mask. Charles Worley testified that Superior Granite primarily bought sand and respiratory equipment from Bicknell Supply and Miles Supply and that these suppliers sent salesmen to the job site. Business invoices reveal that Superior Granite purchased non-air-supplied hoods for sandblasting from both Bicknell Supply and Miles Supply. Miles Supply and Bicknell Supply never warned or advised Charles Worley as to what equipment he should use to protect a sandblaster, including the fact that an air-supplied hood was required for sandblasting in a sandblast room.

In late 2006 and early 2007, Fouch began having trouble breathing, had chest pains, began wheezing, and became easily fatigued. When the problems continued, Fouch quit his employment at Superior Granite in October 2007. In January 2008, Fouch was diagnosed with silicosis as a result of his work as a sandblaster, and he subsequently received a double-lung transplant. Fouch then filed the instant lawsuit.

Fouch identified three experts in support of his product liability and negligent failure to warn claims, all of whom were deposed: Dr. Vernon Rose is a Certified Industrial Hygienist, a Certified Safety Professional, and a Professional Engineer who worked for NIOSH in the 1970s ; Dr. Edward Karnes is a human factors and warnings

7

expert ; and Darrell Bevis is an industrial hygienist who specializes in respiratory protection .

Dr. Rose specifically testified that non-air supplied sandblasting hoods should have never been sold because "they essentially provide no protection against the inhalation of respirable silica airborne particles." Dr. Rose opined that the non-air supplied hoods would be misused because workers would mistakenly think they were adequately protected and would be more willing to do hazardous work.

According to Dr. Rose, certain studies – such as the Boeing Study – revealed that individuals wearing a non-air fed hood are exposed to respirable silica at levels far exceeding the permissible exposure limit. These studies further found that small employers are not aware or do not fully appreciate the hazards of sandblasting or the potential for developing silicosis as a result of sandblasting. The Boeing Study has been publicly available since the early 1970s and would have been readily available to manufacturers and suppliers of sandblasting equipment, like the Defendants. Bevis testified that small sandblasting companies, like Fouch's employers, rely on manufacturers and suppliers of sandblasting products to provide accurate and complete information about their products.

According to Bevis, both Miles Supply and Bicknell Supply make incorrect and highly improper representations in their catalogs. Specifically, Miles Supply's catalogue referenced the non-air-supplied hood as a "sandblast hood," which in Bevis's opinion would lead small employers to believe they were buying proper respiratory equipment. Similarly, Bicknell Supply's advertisement of the canvas hood indicated in its catalogue that the non-air-supplied hood was not respiratory protection and must be used with proper respiratory protection.[4] Bevis opined that the representations made by Bicknell Supply and Miles Supply were improper because employers and employees could reasonably believe that using a respirator under the canvas hood would provide proper respiratory protection.

Dr. Karnes opined that neither Fouch nor his supervisor at Superior Granite, Charles Worley, had sufficient knowledge to appreciate the hazards of sandblasting. Dr. Rose believed that manufacturers and suppliers had a major responsibility to ensure that workers had the proper information and proper respiratory equipment, and

---

[4] The record also contains a Bicknell Supply catalogue from March 2007 that shows the canvas hood being marketed as a sandblasting accessory and which did not contain a warning that the hood did not provide respiratory protection or that proper respiratory equipment must be used with the hood.

9

that the non air-fed hoods should be accompanied by a warning label specifically stating that the hood is not to be used when sandblasting.

Based on his experience, Dr. Rose testified that if Fouch wore a non-air fed hood with a Dustfoe respirator while sandblasting, Fouch would have been overexposed to respirable silica. According to Dr. Rose, this overexposure would contribute to the development of a respiratory disease. Both Dr. Rose and Bevis opined that Fouch was overexposed to respiratory silica due to the improper respiratory protection he was provided.

1. Fouch contends that the trial court erred in granting summary judgment to Mine Safety Appliances and Bicknell Supply on proximate cause grounds. We agree.

Regardless of whether the plaintiff proceeds under a theory of negligence or strict liability, a plaintiff must prove as part of his case that the defendant's product was the proximate cause of the injuries alleged. See *John Crane, Inc. v. Jones*, 278 Ga. 747, 751-752 (604 SE2d 822) (2004); *Talley v. City Tank Corp.*, 158 Ga. App. 130, 134 (3) (279 SE2d 264) (1981). "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." (Citation omitted.) *Ogletree v. Navistar Intl. Transp. Corp.*, 245 Ga. App. 1, 3 (1) (535 SE2d 545) (2000).

10

In cases involving toxic chemicals, a plaintiff must offer proof of general causation – that exposure to a substance is capable of causing a particular injury or disease – and proof of specific causation – that exposure to a substance under the circumstances of the case contributed to his illness or disease. See *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 25 (1) (712 SE2d 537) (2011); *Fulmore v. CSX Transp., Inc.*, 252 Ga. App. 884, 891 (1) (557 SE2d 64) (2001), overruled on other grounds, *Norfolk & Western R. Co. v. Ayers*, 538 U. S. 135, 151 (III) (B), n.11, 157 (III) (C) (123 SCt 1210, 155 LEd2d 261) (2003). While proving both types of causation involves a question of the concentration levels of the toxin to which the plaintiff was exposed, there is no specific requirement that the plaintiff show specific air measurement readings or dosage amounts in order to establish causation. See *Fulmore*, supra, 252 Ga. App. at 892 (1). Rather, in toxic tort cases, proof of causation generally requires reliable expert testimony which is "based, at the least, on the determination that there was a *reasonable probability* that the negligence caused the injury. [T]he testimony must show at least a probable cause, as distinguished from a mere possible cause." (Citations, punctuation, and footnote omitted.) *Rodrigues v. Georgia-Pacific Corp.*, 290 Ga. App. 442, 444 (661 SE2d 141)

11

(2008) (emphasis added); see also *Fulmore*, supra, 252 Ga. App. at 892 (1) (in toxic tort cases, expert testimony is generally required to establish causation).

In a case such as this involving multiple tortfeasors, an individual tortfeasor's conduct need only constitute a contributing factor, not a "substantial" factor, in the injury in order for the tortfeasor's conduct to be considered a proximate cause. See *John Crane*, supra, 278 Ga. at 748-751; *Thompson v. Thompson*, 278 Ga. 752, 753-754 (605 SE2d 30) (2004). Just as there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several tortfeasors, see *Walker v. Giles*, 276 Ga. App. 632, 643 (2) (624 SE2d 191) (2005), there is no requirement that a defendant's products be the sole cause in order to establish proximate cause. See *Fulmore*, supra, 252 Ga. App. at 894 (1).[5]

In this case, it is undisputed that as a result of his sandblasting employment, Fouch contracted silicosis, which by definition, results only from an overexposure to silica. OCGA § 51-14-3 (22) ("Silicosis means nodular interstitial fibrosis of the lung

---

[5] We note that for certain asbestos and silica claims that accrued after May 1, 2007, a claimant is required to show that exposure to asbestos or silica was a substantial contributing factor in the person's disease. OCGA § 51-14-3 (17) (B) (ii) (for abestos claims alleging cancer other than mesothelioma), (18) (B) (i) (for silica-related cancer claims). Fouch's silica claim was based on progressive massive fibrosis, and the "substantial contributing factor" element is not required for such claims. See OCGA § 51-14-3 (18) (B) (ii).

produced by inhalation of silica.") (punctuation omitted). As a result, Fouch did not have to establish that he was exposed to a specific threshold level of silica necessary to induce silicosis. See *Fulmore*, supra, 252 Ga. App. at 892 (1) ("As the only purpose of the [threshold level of exposure value ("TLV")] is to determine at what level exposure to asbestos becomes dangerous, the existence of asbestosis renders moot the inquiry as to how many doses it takes to cause the disease. If that is not true, then the theory upon which the TLV is established is not true.").

It is also undisputed that the only acceptable respirator to be used during abrasive sandblasting that was primarily involved in this case is an air-supplied hood. Moreover, the undisputed evidence showed that Fouch did not wear the required respiratory equipment during his employment with Majestic Granite and Superior Granite. At Majestic Granite, Fouch sandblasted while using a canvas, non-air supplied hood and either a paper mask or an air-supplied respirator underneath the hood. The canvas hoods were supplied, in part, by Bicknell Supply. At Superior Granite, Fouch wore three Dustfoe respirators that were manufactured by Mine Safety Appliances.

Fouch's experts – Dr. Rose and Bevis – testified that, based upon the Boeing Study that had been available since the 1970s, Fouch was overexposed to respirable

13

silica because the study showed that respirable silica levels far exceeded the permissible limit when wearing non-air-supplied hoods. According to Dr. Rose, this overexposure would contribute to the development of a respiratory disease.

In *Fulmore*, the plaintiffs' experts testified that the plaintiffs' exposures to visible dust from the use of asbestos-containing products exceeded the permissible threshold values. *Fulmore*, supra, 252 Ga. App. at 890-891 (1). Like *Fulmore*, the expert opinions in this case were not challenged. See id. Indeed, Mine Safety Appliances conceded that the expert opinions were admissible and undisputed for purposes of summary judgment. While the trial court in this case did not specifically strike the experts' testimony, it erred to extent it discounted the experts' testimony without conducting a thorough *Daubert* analysis. See *United States v. Frazier*, 387 F.3d 1244, 1260 (III) (A) (11th Cir. 2004) (in considering the admissibility of expert evidence, the trial court is required to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility); OCGA § 24-9-67.1 (f) (2012)[6] (providing that in interpreting and applying the code section governing the admissibility of expert witnesses, the courts of this State may draw

[6] OCGA § 24-9-67.1 was repealed on January 1, 2013, coinciding with the effective date of Georgia's new evidence code, and replaced by OCGA § 24-7-702.

from the opinions of federal courts applying the *Daubert* standards). Additionally, the expert opinions in this case relied upon a study that demonstrated that Fouch, given the respiratory equipment he used, was overexposed to a toxic chemical, namely respirable silica, at a level that exceeded the permissible limits. As discussed in *Fulmore*, supra, 252 Ga. App. at 892 (1), the only purpose of an exposure limit is to determine at what level a toxic chemical becomes dangerous, and the existence of an illness caused by exposure to the toxic chemical "renders moot the inquiry as to how many doses it takes to cause the disease." Given that Fouch presented some expert evidence of specific causation, the trial court erred in granting summary judgment on this ground.[7]

Contrary to the assertions by Bicknell Supply and Mine Safety Appliances, this Court's decision in *Butler*, supra, does not compel a different result. In *Butler*, the trial court, after conducting a rigorous *Daubert*[8] analysis, as distinguished from the

---

[7] To the extent Fouch may have been responsible for some of his injury due to his failure to wear any respiratory protection at all during some of the time he was employed by Majestic Granite and Superior Granite, he is not necessarily precluded from obtaining relief. Instead, he may be apportioned some share of fault for his own injury. OCGA § 51-12-33 (a).

[8] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993).

lack of such analysis in this case, struck the opinion of a proffered expert because he relied upon an untested theory that any exposure to asbestos would contribute to the development of mesothelioma; relied upon a study that was not limited to the type of asbestos involved in the case; and overestimated the amount of asbestos to which the plaintiff had been exposed. *Butler*, supra, 310 Ga. App. at 24, 25-28 (1). This Court held that the trial court did not abuse its discretion in striking the expert's testimony, id. at 29 (1) (d), and then affirmed the grant of summary judgment to the defendant because "[a]bsent reliable expert testimony that exposure to [the defendant's] product contributed to the development of [the plaintiff's] mesothelioma, there is insufficient evidence to create a jury issue as to causation." (Footnote omitted.) Id. at 30 (2). Contrary to the trial court's reading of *Butler*, however, this Court did not hold that a plaintiff must establish the specific amount of exposure to a toxic chemical in order to prove specific causation. In fact, *Butler* noted this Court's decision in *Fulmore*, but distinguished it because the expert opinions in *Fulmore*, like the case here, were not excluded. See *Butler*, supra, 310 Ga. App. at 29-30 (1) (d). Therefore, we reverse the trial court's proximate cause ruling.

Since the trial court granted summary judgment to Mine Safety Appliances on Fouch's strict liability claim on the ground that he failed to create a factual question

on the issue of proximate cause, the grant of summary judgment on the strict liability claim was erroneous, and the claim is, therefore, still viable. We need not discuss Fouch's arguments on the matter any further. Consequently, we reverse the trial court's grant of summary judgment on the strict liability claim against Mine Safety Appliances.

2. Fouch also contends that the trial court erred in finding that the Defendants had no duty to warn him or his employers of the dangers posed by sandblasting with their products. We agree that questions of fact remain on this issue.

Under Georgia law, "the manufacturer of a product which, to its actual or constructive knowledge, involves a danger to users, has a duty to give warning of such danger." (Citations and punctuation omitted.) *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1) (450 SE2d 208) (1994). Similarly, "the distributor of a product which, to its actual or constructive knowledge, involves danger to users has a duty to give warning of such danger at the time of sale and delivery." (Citations and punctuation omitted.) *Farmer v. Brannan Auto Parts, Inc.*, 231 Ga. App. 353, 354 (1) (498 SE2d 583) (1998).

> Whether a duty to warn exists depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible of

17

summary adjudication and should be resolved by a trial in the ordinary manner.

(Footnote omitted.) *R & R Insulation Svcs., Inc. v. Royal Indem. Co.*, 307 Ga. App. 419, 427 (3) (705 SE2d 223) (2010).

Nevertheless, a manufacturer or distributor has no duty to warn of a product-connected danger which is obvious or generally known. Id. Under the learned-intermediary rule, "[w]here the product is vended to a particular group or profession, the manufacturer is not required to warn against risks *generally* known to such group or profession." (Citation and punctuation omitted; emphasis supplied.) *Carter v. E.I. DuPont de Nemours & Co., Inc.*, 217 Ga. App. 139, 140 (456 SE2d 661) (1995); see also *Farmer*, supra, at 355 (1). A similar rule "applies where it appears that the person using the product should know of the danger, or should in using the product discover the danger." (Footnote omitted.) *R & R Insulation,* supra, 307 Ga. App. at 427 (3).

In this case, Fouch admits that he knew of the general risks associated with sandblasting and that he was required to wear respiratory protection. A factual issue remains, however, regarding whether Fouch was aware of the specific risks of using the Defendants' products. According to the testimony of Fouch's experts, the Boeing Study – which has been publicly available since the 1970s – revealed that small

18

employers are not aware or do not fully appreciate the hazards of sandblasting or the potential for developing silicosis as a result of sandblasting. Indeed, Fouch's supervisor at Superior Granite, Charles Worley, wrongly believed that an air-supplied respirator and mask were sufficient respiratory protection against the dangers of sandblasting with silica sand. Similarly, the person who trained Fouch at Majestic Granite wore the same equipment that Fouch did when he sandblasted, which is to say that he did not wear sufficient protection either. Moreover, it is undisputed that Fouch's employers never supplied the proper equipment – an air supplied hood, as opposed to an air-supplied respirator – that would have adequately protected Fouch while sandblasting.

Fouch's industrial hygienist expert, Bevis, testified that small sandblasting companies, like Fouch's employers, rely on manufacturers and suppliers of sandblasting products to provide accurate and complete information about their products. Fouch's experts testified that the Defendants' warnings were inadequate to properly warn Fouch that their equipment should not be generally used for the type of sandblasting Fouch was conducting. In particular, Mine Safety Appliances' Dustfoe respirators had no warning at all that they were unfit for use in sandblasting.

Additionally, although the canvas non-air-supplied hoods and sand bags that were distributed by Bicknell Supply and Miles Supply warned that only NIOSH-approved respirators should be used when sandblasting, Miles Supply's catalogue referenced the non-air-supplied hood as a "sandblast hood," which in Bevis's opinion would lead small employers to believe they were buying proper respiratory equipment. Similarly, the evidence shows that Bicknell Supply's representation that its canvas hood would provide adequate respiratory protection when used with a respirator underneath was improper according to Fouch's expert because such a configuration was not adequate under the circumstances in which Fouch sandblasted. Moreover, one catalogue from Bicknell Supply contained no warning stating that the canvas hood did not provide respiratory protection or that proper respiratory equipment must be used with the hood.

Consequently, the trial court's conclusion that Fouch was charged as a matter of law with the knowledge of the dangers of using the non-air-supplied hoods and respirators is not supported by the facts construed in the light most favorable to Additionally, to the extent the Defendants rely upon *Stiltjes v. Ridco Exterminating Co., Inc.*, 178 Ga. App. 438 (343 SE2d 715), aff'd 256 Ga. 255 (347 SE2d 568) (1986), and other cases to assert that they had no duty to warn Fouch because his

20

employers were learned intermediaries, their argument is unavailing. This Court, while reviewing *Stiltjes* and other caselaw, has held that no case has ever held "that the manufacturer may *always* rely on an intermediary to pass along to the ultimate user warnings of dangers inherent in the use of a product." (Emphasis in original.) *Carter*, supra, 217 Ga. App. at 142. Rather, under the proper application of the "learned-intermediary doctrine," a manufacturer's or supplier's duty to warn an ultimate consumer, like Fouch, can be discharged by a warning given to an intermediary party under a balancing test of several factors: "the burden of requiring a warning; the likelihood that the intermediary will provide a warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm." (Citation and punctuation omitted.) *Carter*, supra, 217 Ga. App. at 143; see also Restatement (Second) of Torts, § 388, comment n (1965). This balancing test has not been undertaken in this case, and, as demonstrated above, there are serious questions of fact regarding Fouch's employers' appreciation of the hazards of sandblasting and their knowledge as to the proper respiratory equipment to provide their employees. Given this evidence, factual questions exist on the Defendants' duty to warn Fouch notwithstanding any

21

intermediary. Accordingly, the trial court erred in granting summary judgment to the Defendants.

*Judgment reversed. Barnes, P. J., and Ray, J., concur.*