**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 31, 2025**

# In the Court of Appeals of Georgia

A25A1377, A25A1378. STERIGENICS US LLC et al. v. MUTZ et al.; and vice versa.

A25A1379, A25A1380. STERIGENICS US LLC et al. v. HAYES; and vice versa.

A25A1381, A25A1382. STERIGENICS US LLC et al. v. STEPHENS et al.; and vice versa.

A25A1383, A25A1384. STERIGENICS US LLC et al. v. FRANKS et al.; and vice versa.

A25A1385, A25A1386. STERIGENICS US LLC et al. v. BONNER; and vice versa.

A25A1387, A25A1388. STERIGENICS US LLC et al. v. GIL et al.; and vice versa.

A25A1389, A25A1390. STERIGENICS US LLC et al. v. CASSACIA et al.; and vice versa.

A25A1391, A25A1392. STERIGENICS US LLC et al. v. HARRELL; and vice versa.

BARNES, Presiding Judge.

These related appeals arise from multiple toxic tort suits brought in the State

Court of Cobb County, where the plaintiffs allege that they developed various types

of cancers and birth defects as a result of exposures to ethylene oxide ("EtO") emitted from a medical equipment sterilization facility operated by Sterigenics U. S., LLC in Cobb County, Georgia.[1] The present appeals center on eight bellwether plaintiffs whose cases were consolidated for purposes of discovery and pretrial motions. After an initial phase of discovery, Sterigenics moved to exclude the expert testimony on general causation presented by the bellwether plaintiffs and for summary judgment based on a lack of proof of general causation, and the trial court entered an order granting in part and denying in part those motions. These appeals from that order followed.[2]

---

[1] The defendants in these cases are Sterigenics U. S., LLC; its parent company, Sotera Health, LLC; and the premises owner, Prologis First U. S. Properties, LP. The defendants are referred to collectively as "Sterigenics."

[2] There are sixteen related appeals challenging the trial court's order — eight appeals and eight cross-appeals. The eight appeals are: *Sterigenics U. S. LLC et al. v. Mutz et al.*, Case No. A25A1377; *Sterigenics U. S. LLC et al. v. Hayes*, Case No. A25A1379; *Sterigenics U. S. LLC et al. v. Stephens et al.*, Case No. A25A1381; *Sterigenics U. S. LLC et al. v. Franks et al.*, Case No. A25A1383; *Sterigenics U. S. LLC et al. v. Bonner*, Case No. A25A1385; *Gil et al. v. Sterigenics U. S. LLC et al.*, Case No. A25A1388; *Sterigenics U. S. LLC et al. v. Cassacia et al.*, Case No. A25A1389; and *Sterigenics U. S. LLC et al. v. Harrell*, Case No. A25A1391. The eight cross-appeals are: *Mutz et al. v. Sterigenics U. S. LLC et al.*, Case No. A25A1378; *Hayes v. Sterigenics U. S. LLC et al.*, Case No. A25A1380; *Stephens et. al. v. Sterigenics U. S. LLC et al.*, Case No. A25A1382; *Franks et al. v. Sterigenics U. S. LLC et al.*, Case No. A25A1384; *Bonner v. Sterigenics U. S. LLC et al.*, Case No. A25A1386; *Sterigenics U. S. LLC et al.*

The central question on appeal is whether Georgia courts should apply the standard adopted by the United States Court of Appeals for the Eleventh Circuit in determining the admissibility of expert testimony on general causation in toxic tort cases under OCGA § 24-7-702 (b) ("Rule 702"). Because Rule 702 (b) is materially identical to Federal Rule 702, we conclude that Georgia courts should apply the Eleventh Circuit standard as enunciated in *McClain v. Metabolife Intl., Inc.*, 401 F3d 1233 (11th Cir. 2005) and its progeny. And because the trial court did not properly apply that standard, we vacate the trial court's order and remand for the court to apply it in the first instance.

1. *Causation in Toxic Tort Cases.* Before turning to the factual and procedural background of these appeals, we begin with a legal overview. Causation is an essential element of a toxic tort claim in Georgia. *Ga. Power Co. v. Campbell*, 360 Ga. App. 422, 428 (2) (b) (861 SE2d 255) (2021).

> In addition to establishing exposure to a toxic chemical, a plaintiff must offer proof of general causation — that exposure to a substance is capable of causing a particular injury or disease — and proof of specific

---

*v. Gil et al.*, Case No. A25A1387; *Cassacia et al. v. Sterigenics U. S. LLC et al.*, Case No. A25A1390; and *Harrell v. Sterigenics U. S. LLC et al.*, Case No. A25A1392.

causation — that exposure to a substance under the circumstances of the case contributed to his illness or disease.

(Citation and punctuation omitted.) Id. at 427 (2). Proof of causation in a toxic tort case "generally requires reliable expert testimony." (Citation and punctuation omitted.) Id. at 428 (2) (b).

*Expert Testimony under the Georgia Evidence Code.* Only general causation is at issue in these appeals. To determine the admissibility of expert general causation testimony, we look to Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) The testimony is based upon sufficient facts or data; (3) The testimony is the product of reliable principles and methods; and (4) The expert has reliably applied the principles and methods to the facts of the case.

OCGA § 24-7-702 (b).

Rule 702 (b) "requires a trial court to sit as a gatekeeper and assess the reliability of proposed expert testimony, applying the principles identified in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and

its progeny." (Citations and punctuation omitted.) *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015). In addressing reliability, "the trial court must consider whether the methodology by which the expert reaches his conclusions is sufficiently reliable." (Citation and punctuation omitted.) *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016). Whether an expert's testimony is reliable and admissible are questions "committed to the sound discretion of the trial court." (Citations and punctuation omitted.) *Miller v. Golden Peanut Co.*, 317 Ga. 22, 30 (2) (891 SE2d 776) (2023). "The proffering party bears the burden of presenting evidence of reliability in order to meet the standards of [Rule 702 (b)]." (Citation and punctuation omitted.) *Ovation Condo. Assn. v. Cox*, 374 Ga. App. 681, 687 (1) (913 SE2d 819) (2025).

Rule 702 (b) is materially identical to Federal Rule 702 and to former OCGA § 24-9-67.1 (b) of the old Georgia Evidence Code. *Emory Univ. v. Willcox*, 355 Ga. App. 542, 542 (1) (844 SE2d 889) (2020). In this scenario, our Supreme Court has held that the new Evidence Code provision "reflects the federal rule's meaning, displacing any other." *State v. Almanza*, 304 Ga. 553, 558 (2) (820 SE2d 1) (2018). See *Willcox*, 355 Ga. App. at 542 (1). Thus, in construing Rule 702 (b), we "look to federal

appellate precedent until a Georgia appellate court decides the issue under the new Code," and Rule 702 now should be "read as interpreted by the federal appellate courts as of the effective date of the new Code."[3] (Citation and punctuation omitted.) *Almanza*, 304 Ga. at 558 (2). See *Miller*, 317 Ga. at 26 (1) (a); *Wright v. State*, 374 Ga. App. 28, 31 (910 SE2d 839) (2024); *Willcox*, 355 Ga. App. at 542-543 (1). "In the case of conflicts among the decisions of the various circuit courts of appeals in interpreting the federal rules of evidence, the precedent of the Eleventh Circuit prevails." (Citations and punctuation omitted.) *Almanza*, 304 Ga. at 559 (3). Conversely, "we do not look to cases decided under our former Evidence Code . . . because that precedent did not survive the adoption of the new Evidence Code." (Citations and punctuation omitted.) *Willcox*, 355 Ga. App. at 542-543 (1). See *Almanza*, 304 Ga. at 555 (1).

Although there are Georgia cases addressing Rule 702 (b) generally, no Georgia courts have addressed the specific aspect of Rule 702 (b) at issue in this appeal, namely, the application of the reliability requirement to opinions regarding general

---

[3] The effective date was January 1, 2013. See Ga. L. 2011, p. 99, § 1; *Parker v. State*, 296 Ga. 586, 590 (2) (a) (769 SE2d 329) (2015). "While still persuasive authority, any subsequent federal appellate case law lacks the same precedential weight as cases before that date." *Almanza*, 304 Ga. at 559 (3), n. 5.

causation in toxic tort cases. We therefore turn to federal decisions, and to the decisions of the Eleventh Circuit in particular, for guidance.

*The Eleventh Circuit's McClain Decision and Its Progeny.* In *McClain*, 401 F3d 1233, the Eleventh Circuit discussed the application of Federal Rule 702 and *Daubert*, 509 U. S. 579, to a toxic tort case where the issue was the reliability and admissibility of expert testimony regarding general causation, i.e., "the general question of whether the drug or chemical can cause the harm the plaintiff alleges."[4] (Emphasis omitted.) *McClain*, 401 F3d at 1239. See id. (explaining that general causation asks "whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease") (citation and punctuation omitted). The Eleventh Circuit devised a two-tier classification system to evaluate the admission of expert testimony on general causation in toxic tort cases, delineating between two categories of alleged toxins with different standards applicable to each. Id. The Eleventh Circuit explained:

---

[4] *McClain* was a diversity case in which the plaintiffs asserted tort and other claims under Alabama law. See *McClain v. Metabolife Intl., Inc.*, 193 FSupp.2d 1252, 1254 (N.D. Ala. 2002), rev'd, *McClain*, 401 F3d 1233.

> toxic tort cases usually come in two broad categories: first, those cases in which the medical community generally recognizes the toxicity of the drug or chemical at issue, and second, those cases in which the medical community does not generally recognize the agent as both toxic and causing the injury plaintiff alleges. Examples of the first type include toxins like asbestos, which causes asbestosis and mesothelioma; silica, which causes silicosis; and cigarette smoke, which causes cancer.

Id.[5] In cases that fall within the first category, where the medical community "routinely and widely" recognizes that the drug or chemical "causes the type of harm the plaintiff alleges," courts "need not undertake an extensive *Daubert* analysis on the general toxicity question" and the focus instead is on specific causation. Id. at 1239 & n. 5. In contrast, in the second category of toxic tort cases, the plaintiff must establish general causation through reliable expert testimony under a more exacting standard. Id.

Addressing the second category of toxic tort cases, the Eleventh Circuit advised that when evaluating an expert's opinion on general causation, courts "should pay

---

[5] As the examples given in *McClain* make clear, a drug or chemical can fall within the first category even if it does not cause a "signature" illness similar to asbestos or silica. See also 401 F3d at 1239, n. 5. (giving as examples cigarettes, which cause lung cancer and heart disease, and alcohol, which causes cirrhosis of the liver, as examples of drugs or chemicals falling within the first category of toxic tort cases).

careful attention to the expert's testimony about the dose-response relationship." *McClain*, 401 F3d at 1241. The Eleventh Circuit explained that "[t]he dose-response relationship is a relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change — either an increase or decrease — in risk of disease," and that "the relationship between dose and effect . . . is the hallmark of basic toxicology." (Citations and punctuation omitted.) Id. at 1241-1242. The Eleventh Circuit further explained that "because of individual variation, a toxic agent generally will not cause disease in every person exposed," and thus a general causation expert should offer an opinion "about the general dose-response levels for the [drug or chemical's] toxicity, i.e., the dose or level of exposure at which it causes harm." (Citation and punctuation omitted.) Id. at 1241. An expert who avoids or neglects testifying about such dose-response levels without justification "casts suspicion on the reliability of his methodology." Id. at 1242.

Applying these principles, the Eleventh Circuit in *McClain* held that the case before it, which involved a defendant company's drug combination of caffeine and ephedrine, fell in the second category of toxic tort cases requiring expert general causation testimony, as "the medical community does not generally recognize the

toxicity of this drug combination or ephedrine alone as causing the injuries Plaintiffs allege." 401 F3d at 1239. The Eleventh Circuit went on to hold that the district court should have excluded the plaintiffs' general causation expert who "agreed that a drug's effect is dose-driven" but "offered no testimony about the dose of" the drug combination "required to injure Plaintiffs or anyone else" and instead "opined that any level is too much." Id. at 1241. Because the expert did not "provide any opinions" about the "level of exposure at which [the alleged substance] causes harm," the Eleventh Circuit held that the expert failed to employ a reliable dose-response methodology for determining general causation in a toxic tort case, such that his opinion was inadmissible under Federal Rule 702. Id. at 1241-1242, 1251-1252.

More recently, the Eleventh Circuit discussed *McClain* and subsequent circuit opinions and reiterated the importance of expert testimony on the dose-response relationship in the second category of toxic tort cases. *In re Deepwater Horizon BELO Cases*, 119 F4th 937, 945 (11th Cir. 2024) (discussing cases). The Eleventh Circuit again emphasized that the relationship between dose and response is "the hallmark of basic toxicology because all substances potentially can be toxic," and "[m]ost low dose exposures — even for many years — will have no consequences at all."

(Citations and punctuation omitted.) Id. at 941. And the Eleventh Circuit again held that reliable expert opinion on the dose-response relationship must "identify a harmful level at which a chemical could cause the harm alleged." (Punctuation omitted.) Id. at 945.[6]

At the same time, however, Eleventh Circuit cases since *McClain* have left open the possibility that general causation in the second category of toxic tort cases can be proven using methodologies other than dose-response. Specifically, the Eleventh Circuit has identified two other potential methodologies for proving general causation in this context: epidemiological evidence and background risk of disease. See *In re Deepwater Horizon BELO Cases*, 119 F4th at 941-942; *Chapman v. Procter & Gamble Distrib.*, 766 F3d 1296, 1307-1308 (11th Cir. 2014).

---

[6] See also *Taylor v. Mentor Worldwide*, 940 F3d 582, 595 (11th Cir. 2019) (explaining that in cases involving toxic drugs and chemicals, "given the importance of individual responses to toxins," a plaintiff's general causation expert "must demonstrate . . . the level of exposure to the allegedly harmful chemical that is hazardous to a human being") (citation and punctuation omitted); *Chapman v. Procter & Gamble Distrib.*, 766 F3d 1296, 1307-1308 (11th Cir. 2014) (affirming exclusion of general causation testimony offered by plaintiffs' experts in toxic tort case, where the experts failed to testify as to "how much" of the alleged toxin "must be used for how long to increase the risk").

2. Against this legal backdrop, we turn to the pertinent factual and procedural history of the present case. The record reflects that EtO is a major industrial chemical used in the production of several other industrial chemicals and as a pesticide, fumigant, and anti-microbial in many industries, including health care, medical device production, and food sterilization. In addition to emissions of EtO from industrial facilities, the atmosphere contains background levels of EtO.

For decades, Sterigenics and its predecessors have used EtO to sterilize medical supplies at a facility in Cobb County, and it is undisputed that the facility has emitted EtO into the air as part of its sterilization operations, although the parties dispute in what amounts and concentrations. The bellwether plaintiffs lived, worked, and went to school near the Sterigenics' EtO sterilization facility and have been diagnosed with forms of hematopoietic, lymphatic, or breast cancers or birth defects. They, along with others who lived and worked near the sterilization facility and had been diagnosed with cancer, filed toxic tort suits against Sterigenics in the State Court of Cobb County, alleging that emissions of EtO from the facility caused their cancers and birth defects.

The bellwether plaintiffs tendered three experts who provided opinion testimony regarding general causation: Dr. Leslie Stayner, Dr. Dean Felsher, and Dr. Aliasger Salem, who each had academic, work, and research experience in their respective fields of epidemiology, oncology, and cancer biology.

Dr. Stayner opined that there is strong evidence that exposure to EtO increases the risk of lymphatic, hematopoietic, and breast cancers. He testified that his causation opinion was "independent of dose" and that "it's unlikely there's a safe level of exposure or threshold."

Dr. Felsher opined that exposure to EtO can cause lymphatic, hematopoietic and breast cancers. He testified that exposure to EtO at "any level above background potentially can be a contributing cause" of cancer. He further testified that EtO exposure can cause "embryonic, reproductive, and developmental defects," that there is a correlation with "intensity of exposure," and that "it wouldn't take much" EtO to cause defects because an "embryo is only an embryo for a few days."

Dr. Salem opined that exposure to EtO can cause hematopoietic and breast cancers and birth defects. According to Dr. Salem, EtO "exposure above background increases the risk of cancer" in a manner "proportional to dose and duration," and

"any exposure of [EtO] above background increases the risk of chromosomal aberrations and birth defects in a dose- and duration-dependent manner."

Sterigenics moved to exclude the general causation testimony of the plaintiffs' three experts under Rule 702 (b) as unreliable and for summary judgment based on lack of proof of general causation. Sterigenics and the plaintiffs disputed whether *McClain* and its progeny should guide the analysis, and if so, whether EtO fell within the first or second category of toxic tort cases, and whether the plaintiffs' experts had to identify a threshold level or dose at which EtO is capable of causing the cancers and birth defects suffered by the plaintiffs.

In a detailed order, the trial court granted in part and denied in part Sterigenics' motions. More specifically, the trial court excluded the testimony of Dr. Felsher and Dr. Salem but ruled that the testimony of Dr. Stayner was admissible. In so ruling, the trial court discussed the Eleventh Circuit's decision in *McClain*, noting that case's distinction between the two categories of toxic tort cases and the different standards applicable to each, but decided that "EtO falls into a category between one and two." While the trial court found that the plaintiffs had "shown that EtO is generally recognized as a carcinogen," the court related that it "was hesitant to uniformly

declare EtO a category one toxin" for which general causation would be presumed because EtO does not have a unique "one-to-one relationship" with a signature disease, as asbestos does to asbestosis and silica does to silicosis.

The trial court further explained that it did not believe that the present case fell squarely within the second category of toxic tort cases. The trial court concluded that where the scientific community generally considers a substance to be toxic, and a qualified expert testifies that "*any* exposure" to that toxin can cause harm, "then a specific dose-response relationship is not required to prove general causation," and the expert does not have to identify a harmful level at which the toxin could cause the harms alleged. (Emphasis in original.) Applying what it characterized as a "third way" approach, the trial court found that Dr. Stayner's expert testimony indicating that "any exposure" to EtO can cause cancer was admissible under Rule 702 (b), but that Dr. Felsher and Dr. Salem's testimony that exposures "above background" could cause cancer was not. The trial court further ruled that Dr. Felsher and Dr. Salem focused almost exclusively on the link between EtO and cancer and had not offered reliable opinions linking EtO to birth defects, such that their opinion testimony about such defects likewise was inadmissible under Rule 702.

Because the trial court ruled that Dr. Stayner's general causation testimony regarding the link between EtO and lymphatic, hematopoietic, and breast cancers was admissible, the trial court denied Sterigenics' motion for summary judgment on the plaintiffs' cancer claims. Because Dr. Stayner did not opine on the link between EtO and birth defects, and in light of the trial court's conclusion that Dr. Felsher and Dr. Salem did not offer reliable opinions regarding birth defects, the trial court granted summary judgment to Sterigenics on the birth defect claims. These appeals followed.

3. Sterigenics argues that the trial court abused its discretion in admitting the testimony of Dr. Stayner, while the plaintiffs argue that the court abused its discretion in excluding the testimony of Dr. Felsher and Dr. Salem. We conclude that the trial court abused its discretion by not applying the proper standard.

As discussed supra in Division 1, because 702 (b) is materially identical to Federal Rule 702 and Georgia courts have not addressed how to apply the reliability requirement of Rule 702 (b) to general causation opinions in toxic tort cases, we look to federal decisions for guidance, particularly the decisions of the Eleventh Circuit. See *Miller*, 317 Ga. at 26 (1) (a); *Almanza*, 304 Ga. at 558 (2); *Wright*, 374 Ga. App. at 31; *Willcox*, 355 Ga. App. at 542 (1). Accordingly, we conclude that Georgia courts

should be guided by and apply the standard announced by the Eleventh Circuit in *McClain* and its progeny when evaluating the reliability and admissibility of opinion testimony on general causation in toxic tort cases.[7]

The plaintiffs argue, however, that the Eleventh Circuit should not be followed because its standard for what constitutes reliable dose-response methodology is inconsistent with Georgia substantive toxic tort law, which, they maintain, does not require quantitative dose-response evidence to prove general causation. In support of their argument, the plaintiffs rely on *Scapa Dryer Fabrics*, 299 Ga. 286, and *Fouch v. Bicknell Supply Co.*, 326 Ga. App. 863, 868 (1) (756 SE2d 682) (2014). In *Scapa Dryer Fabrics*, our Supreme Court noted that exposure to a toxin need not be estimated in "precise quantitative terms," 299 Ga. at 292, n. 9, and in *Fouch*, we stated that a plaintiff is not required to "show specific air measurement readings or dosage amounts in order to establish causation." 326 Ga. App. at 868 (1).

The plaintiffs' reliance on *Scapa Dryer Fabrics* and *Fouch* is misplaced, as the Eleventh Circuit in *McClain* made the same point: "One should not conclude from

---

[7] Although some of the Eleventh Circuit cases discussed in our opinion were decided after enactment of Georgia's new Evidence Code, we find the reasoning of those cases persuasive. See supra footnote 3.

this analysis that to pass *Daubert* muster an expert must give precise numbers about a dose-response relationship. Some ambiguity about individual responses is expected." 401 F3d at 1241, n. 6. See *Williams v. Mosaic Fertilizer*, 889 F3d 1239, 1248 (11th Cir. 2018) ("To be clear, we have never required an expert to give precise numbers about a dose-response relationship, . . . [b]ut we do require an expert to lay a reliable groundwork for determining the dose-response relationship.") (citations and punctuation omitted). Moreover, as previously noted, the Eleventh Circuit has left open the possibility that an expert may be able to establish general causation using methodologies other than the dose-response, namely, through epidemiological evidence and background risk of disease. See *In re Deepwater Horizon BELO Cases*, 119 F4th at 941-942; *Chapman*, 766 F3d at 1307-1308. The Eleventh Circuit standard therefore does not conflict with our substantive toxic tort law and should guide Georgia courts.

The trial court, however, did not apply the Eleventh Circuit standard. Rather, it adopted a "third way" approach where it treated EtO as falling between the first and second categories of toxins delineated in *McClain* and created a modified rule: "[I]f a plaintiff establishes by a preponderance of the evidence that the medical or

scientific community generally accepts the substance as a harmful toxin, and a *Daubert*-qualified expert opines that *any* exposure creates a risk of a plaintiff's harm, then a specific dose response relationship is not required to prove general causation." (Emphasis in original.) But the Eleventh Circuit does not recognize an exception to its two-tier classification system for experts testifying that "any exposure" can cause harm, and *McClain* makes clear that experts who employ a dose-response methodology to prove general causation must identify a harmful level at which the toxin could cause the harm alleged. 401 F3d at 1243.[8] Furthermore, the trial court did not take into account Eleventh Circuit cases indicating that a general causation expert may be able to establish general causation through epidemiological evidence and background risk of disease rather than through dose-response. Consequently, the trial court abused its discretion. See *State v. Brinkley*, 316 Ga. 689, 690 (889 SE2d 787)

---

[8] In creating a category between the first and second category of toxins in cases where an expert opines that "any exposure" creates a risk of harm, the trial court relied on the Eleventh Circuit's decision in *Taylor*, 940 F3d 582. But *Taylor* was a medical product case where the plaintiff alleged that she was injured as the result of the degradation and shedding of a mesh sling manufactured by the defendant that had been surgically implanted. Id. at 586. It was not a toxic tort case, and the Eleventh Circuit expressly distinguished it on that ground and concluded that "[t]he logic of *McClain* . . . [was] not transferrable." Id. at 595.

19

(2023) ("A trial court abuses [its] discretion when it applies the wrong legal standard.").

Because the trial court abused its discretion, we vacate the trial court's order and remand for further consideration under the Eleventh Circuit standard. See *Brinkley*, 316 Ga. at 690. The trial court initially should determine whether EtO falls into the first category of toxic tort cases, that is, whether the medical community routinely and widely recognizes that EtO is both toxic and causes the types of cancers and birth defects alleged by the plaintiffs. If the court determines that EtO falls within the first category, the battleground shifts to specific causation. If the court determines that EtO instead falls in the second category, then the court must address the reliability of the methodology used by the plaintiffs' general causation experts. In doing so, the court must pay careful attention to the experts' testimony about the dose-response relationship and whether the experts have identified a harmful level at which EtO could cause the harms alleged. The trial court also should consider

whether the experts can establish general causation through the alternative methodologies of epidemiology and background risk of disease.

*Judgments vacated and cases remanded with direction. Brown, C. J., concurs. Watkins, J., concurs specially.*

# In the Court of Appeals of Georgia

A25A1377. STERIGENICS US LLC et al v. TOM MUTZ et al.; and related cases.

WATKINS, Judge, concurring specially.

I concur with the majority on these appeals. But I write separately to clarify that to the extent the majority's opinion may be read as suggesting that general causation in a toxic tort case can never be established by expert testimony that "any exposure" to the substance at issue can cause the harm alleged, that goes too far.

In *McClain*, the substance at issue was a drug that combined caffeine and ephedrine, two substances that are widely used and generally recognized as safe. There, it made sense for the court to exclude as unreliable an expert's testimony that "any amount of Metabolife is too much[.]"[1] See *McClain*, 401 F3d at 1240-1244 (III) (A). But this does not mean that expert testimony will always be unreliable if the expert opines that "any exposure" to the substance can cause the harm alleged. Indeed, in *Taylor*, where the plaintiffs claimed that a surgically-implanted mesh sling caused them medical injuries, the Eleventh Circuit held that no evidence regarding a dose-response relationship was required.[2] 940 F3d at 595 (II) (B). The majority

---

[1] Similarly, in *Chapman* (a product liability case concerning a dental adhesive that contained a calcium-zinc compound), the Eleventh Circuit excluded expert testimony given the experts' admissions "regarding their lack of knowledge of dose-response, epidemiological evidence, and background risk of disease[.]" 766 F3d at 1308 (II) (A) (2) (a).

[2] Specifically, the court stated:

In *McClain*, the missing piece — among others — was how much ephedrine and caffeine were required to start a chain reaction leading to a stroke or heart attack. That piece was important because there evidently was a level of ephedrine and caffeine that a person could consume safely. But in this case, Dr. El-Ghannam testified that *all* ObTape degrades and that *any* polypropylene particles it sheds spark a response by the body's immune system, which leads to inflammation and erosion. There was no suggestion that there was a level of degradation

2

distinguishes *Taylor* from *McClain* and the instant case on the ground that *Taylor* "was not a toxic tort case," but the more important distinction is that in *Taylor*, there was no point at which an individual's increase in exposure to the substance tipped that exposure from harmless to harmful.[3] Notably, the Eleventh Circuit itself has cited *Taylor* in recent opinions involving toxic torts. See *Deepwater*, 119 F4th at 945 (III); *Pinares v. Raytheon Techs. Corp.*, No. 19-14831, 2023 U.S. App. LEXIS 7285, 2023 WL 2661521, at *14 (11th Cir. 2023) (unpublished).

Ultimately, as the majority opinion states, to determine whether expert testimony is admissible under Rule 702 (b), the trial court must determine whether the proffered testimony is relevant and reliable. See, e.g., *Ovation*, 374 Ga. App. at 687 (1). In its role as a gatekeeper, the trial court must assess, inter alia, whether the testimony is based upon sufficient facts or data, whether the testimony is based on reliable principles and methods, and whether the expert has reliably applied those principles and methods to the facts of the case. See id. See also *Deepwater*, 119 F4th at 945 (III)

---

that would not cause those harmful effects. 940 F3d at 595 (II) (B).

[3] See footnote 2, supra.

(noting that under *Daubert*, the trial court must "assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue[ ]"). And as the Eleventh Circuit explained in its *Deepwater* opinion, precedent has recognized at least three kinds of evidence that may be used to prove general causation in a toxic tort case: epidemiological evidence, dose-response relationship, and background risk of disease. On remand, the trial court should exercise its role as a gatekeeper and apply the foregoing principles to determine whether the expert opinions that have been proffered in this case are admissible under Rule 702 (b).